UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Theodore Stevie Varner,

        Defendant.

Criminal No. 10-294 (JNE/FLN)

**REPORT AND RECOMMENDATION**

Michael A. Dees, Assistant United States Attorney, for Plaintiff.
Reynaldo A. Aligada, Jr. for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on December 1, 2010 on Defendant's Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 20) and Defendant's Pretrial Motion to Suppress Statements (ECF No. 21). At the hearing, the Court received testimony from Benjamin Lego and Carl M. Schwartz. The Government submitted six exhibits into evidence.[1] The parties have since submitted post-hearing briefs. (ECF Nos. 28 and 32.)

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends Defendant's suppression motions be **GRANTED, in part,** and **DENIED, in part**.

---

[1] Government's Exhibit 1 is a color print-out of an image of a trash can in an alley with the hood of a car in the lower right corner. Government's Exhibit 2 is a color print-out of the front of a squad car parked in an alley. Government's Exhibit 3 is a color print-out of a an image showing a gravel driveway with a squad car parked at the end of it. Government's Exhibit 4 is a color print-out of an image showing a gravel driveway leading to a blue car and a house. Government's Exhibit 5 is an aerial view map. Government's Exhibit 6 is a color print-out of an image of a gun lying on gravel.

1

## I. FINDINGS OF FACT

### A. Testimony of Officer Benjamin Lego

At the hearing in this matter, St. Paul Police Officer Benjamin Lego testified that on the morning of September 22, 2010, he was on duty with his partner, Officer Whittaker. (Tr. 6-7.) At approximately 10:13 a.m., Officer Lego and his partner responded to a 911 call. (Tr. 7.) The 911 call reported a man with a gun in an apartment building on Duluth Street in St. Paul ("the apartment complex"). (Tr. 7.) The suspect was described as a black male with braids wearing a blue or black hooded sweat shirt. (Tr. 10, 26.) The 911 caller identified himself as "Donny," described his clothing and the vehicle he was in, and agreed to meet with police at a specified Super America station. (Tr. 10.)

Officers Lego and Whittaker arrived at the apartment complex within five minutes of receiving the 911 call. (Tr. 9.) The apartment complex is located on the East side of Duluth Street, between Cook Avenue to the North and Lawson Street to the South. (Tr. 8.) Officer Lego took a position on the northwest corner of the building. (Tr. 11.) At that time, Officer Lego saw a green Ford Explorer leaving the eastern parking lot of the apartment complex and approaching his position through the alley north of the apartment complex. (Tr. 11.) Officer Lego testified that he thought the front seat passenger "was possibly our suspect," because he was a black male with braids and a blue sweat shirt. (Tr. 12.) Officer Lego testified that he raised his left hand in a "universal stop motion" and told the driver, "Stop your truck." (Tr. 13.) When the truck didn't stop, he yelled, "Stop your truck," and again, "Police officer. Stop your truck." (Tr. 13.) Officer Lego testified that the driver did not accelerate but just rolled right past him. (Tr. 13.) The truck pulled onto Duluth Street in a northbound direction. (Tr. 13.)

At this point, Officer Lego aired over his radio a description of the truck and that he believed the suspect was in the passenger seat of the truck. (Tr. 13-14.) Lego also indicated that the truck was traveling westbound on Cook Avenue. (Tr. 14.) After giving the description, Officers Lego and Whittaker returned to their vehicle. Officer Lego testified that they were advised by another officer that the suspect had fled "eastbound out of the truck from Frank and then southbound through the yards." (Tr. 15.) Officers Lego and Whittaker then drove into the alley between Cook and Lawson. (Tr. 15.)

Officer Lego testified that once in the alley he saw the man with braids in a blue sweatshirt, who appeared to be the same man he saw in the passenger side of the truck. (Tr. 17.) Officer Lego saw the man fall, then get up and continue across the alley and southbound through a yard. (Tr. 17.) Officer Lego testified that he got out of the car and ran southbound through a yard to Lawson Ave. (Tr. 17.) Officer Lego saw the man run westbound on Lawson until he was stopped at gunpoint by Officer Schwartz at the corner of Frank and Lawson. (Tr. 18, 34.) When Officer Lego reached the corner he re-holstered his gun and put a knee between the suspect's shoulders. (Tr. 34.) When the suspect did not immediately put his hands behind his back in response to Officer Lego's instructions, Officer Lego punched the man three times on the left side and did a "slap stun on the left side of his face and shoulders." (Tr. 34.) Officer Lego then handcuffed him and placed him in the back of his squad car. At the hearing, Officer Lego identified the man he handcuffed as the Defendant, and as the same man he had seen in the Green Explorer and in the alley. (Tr. 19-20.)

Before Defendant was placed in the squad car, he was searched, and Officer Lego found a prescription medication bottle with the label torn off on Defendant's person. (Tr. 21.) Officer

3

Lego testified that after Defendant was placed in the squad car he asked the Defendant general questions in order to verify his identity. (Tr. 21.) Defendant verbally identified himself by name and date of birth. (Tr. 21.) He also told Officer Lego that "he lived on Case Avenue" and that "he had lived there fore some time." (Tr. 21.) When Officer Lego looked Defendant up in the Department of Vehicle Services website he learned that Defendant was a registered sex offender. (Tr. 21.) He also learned that Defendant was registered to an address different than the address on Case Avenue where he had told Officer Lego he was living. (Tr. 21.) Officer Lego testified that he continued to ask Defendant questions about his address after he knew there was "a potential violation of law because of failure to properly register" as a sex offender. (Tr. 36.) Officer Lego also stated that he knew Defendant might incriminate himself about the failure to register. (Tr. 36.) Officer Lego did not give Defendant a *Miranda* warning prior to asking these questions. (Tr. 37.)

While Defendant was in the squad car, Officer Lego learned from other officers that a weapon had been recovered. (Tr. 22.) Officer Lego testified that he did not remember where the weapon was recovered. (Tr. 22.) Defendant was arrested for "probable cause weapon possession, failure to register as a sex offender, and possession of prescription narcotics." (Tr. 22.)

**B.     Testimony of Officer Carl Schwartz**

St. Paul Police Officer Carl Schwartz testified that on the morning of September 22, 2010 he heard the 911 call reporting a black male with braided hair, wearing a dark blue or black hoodie, with a handgun at the apartments on Duluth Street. (Tr. 43.) Officer Schwartz monitored the call on his radio and after clearing another call began working his way to that area.

4

(Tr. 42.)  Officer Schwartz was driving north on Earl Street, about a block south of Cook Avenue, when he heard another officer call his squad number to "stop a male running westbound on Cook Street."  (Tr. 43.)  Officer Schwartz turned right on Cook and began heading eastbound.  (Tr. 43.)  Officer Schwartz testified that as he approached the intersection with Frank Street, he noticed "a black male matching the description, clothing, wearing the dark hoodie, appear from behind the first house on the northeast corner of Frank and Cook and start running across the street in front of me."  (Tr. 43.)  Officer Schwartz aired on his radio that he had the suspect running southbound.  (Tr. 44.)  Officer Schwartz testified that the suspect was holding his pants and his hoodie with his right hand.  (Tr. 44.)  At this time the suspect started to head south and east towards the second house on the south side of the street.  (Tr. 44.)  Officer Schwartz turned right on Frank then left into the alley between Lawson and Cook to "try to cut him off."  (Tr. 44.)

When Officer Schwartz turned into the alley he saw the suspect come out from behind two houses, come over a fence, then trip and land face first in the middle of the alley.  (Tr. 44.)  Officer Schwartz saw a small black item lying in the alley right where the suspect had fallen.  (Tr. 45, 48-49; *See also* Gov't Exs. 1 and 2.)  The suspect then got up and ran southbound through a gravel driveway.  (Tr. 44.)  Officer Schwartz stopped his car and got out to pursue the suspect on foot.  (Tr. 45.)   Officer Schwartz then saw the suspect fall again in a gravel area by a blue car.  (Tr. 45; *See also* Gov't Ex. 4.)  Officer Schwartz chased after him on foot and yelled at him to "get on the ground."  (Tr. 45.)  Officer Schwartz testified that as he ran by the blue car he noticed a "brownish-handled semiautomatic handgun laying in the gravel near where he fell."  (Tr. 45-46; *See also* Gov't Ex. 6.)

Officer Schwartz then continued chasing the suspect, yelling at him to stop and get on the

5

ground. (Tr. 46.) Officer Schwartz had his gun out at this time and told the Defendant, "Stop or I'll shoot." (Tr. 56.) The suspect gave up at the corner of Frank and Lawson. (Tr. 46.) Officer Schwartz then held the suspect there at gunpoint until Officers Lego and Whittaker arrived and placed him in handcuffs. (Tr. 46.) At the hearing, Officer Schwartz identified the Defendant as the man he chased and arrested. (Tr. 52.) After the Defendant was placed in handcuffs, Officer Schwartz asked him why he ran, to which the Defendant replied, "I think I have a warrant." (Tr. 46.) Officer Schwartz did not administer a *Miranda* warning before asking the Defendant why he ran. (Tr. 58.) The Defendant was then placed in the back of Officer Lego's and Officer Whittaker's squad car. (Tr. 47.)

After "a couple of minutes" the camera car arrived. (Tr. 47.) Officer Schwartz lead Officer Jones, who was with the camera car that day, back along the path where he had chased Defendant. (Tr. 47.) They photographed the black object that Officer Schwartz had seen in the alley where the Defendant fell the first time. (Tr. 52; *See also* Gov't Exs. 1 and 2.) At that time an officer opened the black object and removed a plastic card from inside. (Tr. 52.) The card contained Defendant's name, Theodore Varner. (Tr. 52.) They also photographed the gun Officer Schwartz had seen lying next to the blue car. (*See* Gov't Ex. 6.) The black object and the firearm were both recovered at that time. (Tr. 52.)

## II. CONCLUSIONS OF LAW

**A.     Defendant's Motion to Suppress Fruits of Illegal Arrest and Search and Seizure**

Defendant argues that his arrest was without probable cause in violation of the Fourth Amendment, and that therefore all fruit resulting from his arrest, including both statements and items seized from his person, should be suppressed. (*See* ECF No. 28 at 5.)

6

"Probable cause for a warrantless arrest exists 'if the facts and circumstances within the law enforcement officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995), quoting *United States v. Morales,* 923 F.2d 621, 623 (8th Cir. 1991). "The probable cause determination does not depend upon individual facts," but rather "it depends on the cumulative effect of the facts in the totality of the circumstances." *Brown*, 49 F.3d at 1349 (quotation omitted).

Considering the totality of the circumstances the Court concludes that there was probable cause for Defendant's arrest. Here, both officers testified that the 911 caller reported a man with a handgun inside the apartment complex on Duluth Street, and described the suspect as a black man with braids wearing a blue or black hoodie. (Tr. 10, 43.) Officer Lego arrived at the apartment complex within five minutes of receiving the 911 call. (Tr. 9.) Upon arrival, he saw a green Ford Explorer leaving the property with a passenger, later identified as Defendant, who was a black male with braids wearing a blue hoodie sweat shirt. (Tr. 12.) Officer Lego testified that he believed Defendant to be the man identified by the 911 caller based both on the description, and the fact that it was the only vehicle leaving the scene. (Tr. 11-12.) Officer Lego repeatedly told the driver to "Stop your truck," but the truck drove right past him. (Tr. 13.) After being advised by other officers that Defendant had fled the Explorer on foot, Officer Lego encountered him again in an alley where he chased Defendant on foot. (Tr. 17.) Officer Lego ultimately assisted Officer Schwartz in detaining Defendant at the corner of Frank and Lawson. (Tr. 18.)

While neither officer saw a gun in Defendant's possession, Officer Schwartz testified that he saw a gun on the ground where Defendant had fallen. Officer Schwartz testified that the first

7

time Defendant fell in the alley he saw a black object lying on the ground where Defendant had fallen. (Tr. 45.) That object was later found to contain a card bearing Defendant's name. (Tr. 52.) Officer Schwartz then saw Defendant fall in a gravel driveway. (Tr. 45.) While pursuing Defendant, Officer Schwartz saw a "brownish-handled semiautomatic handgun laying in the gravel" where Defendant had fallen. (Tr. 45-46.) Though neither officer saw a gun in Defendant's possession, based on the 911 caller's description, Defendant's flight, and the location of the gun, it was reasonable to believe that the gun came from Defendant when he fell. The totality of the facts and circumstances within the officers' knowledge were sufficient to warrant a reasonable belief that Defendant had committed an offense at the time of his arrest. Minnesota Statute 624.714 (possession of pistol without a permit); *State v. Timberlake*, 744 NW2d 390 (MN 2008); *See Brown*, 49 F.3d at 1349. Consequently, Defendant's arrest was supported by probable cause. His motion to suppress any evidence obtained based upon the arrest must be denied.

### B. Motion to Suppress Statements

Defendant argues that statements he made to Officer Schwartz and Officer Lego at the time of his arrest should be suppressed because he was subjected to custodial interrogation without being advised of his *Miranda* rights in violation of the Fifth Amendment. (*See* ECF No. 28 at 7-8.)

#### 1. Custodial Interrogation Standard

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). A custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

8

Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995), provides a two part test for determining whether an interrogation occurs in custody. The court must inquire: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112. The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Still, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted) (recognizing the validity of considering the "totality of the circumstances" in determining whether a suspect is in custody).

### 2. Statement to Officer Schwartz

Defendant argues that his response to Officer Schwartz' question about "why he ran" should be suppressed because the question constituted custodial interrogation. The Government indicated in its post-hearing brief that it will not use Defendant's statement to Officer Schwartz at trial. (*See* ECF No. 32 at 1, 13.) Defendant's statement to Officer Schwartz should be suppressed.

### 3. Statements to Officer Lego

Defendant argues that questioning by Officer Lego at the time of his arrest constituted custodial interrogation, and that because he was not provided with a *Miranda* warning his answers should be suppressed. (*See* ECF No. 28 at 9-10.) The Court finds that Defendant was in custody at the time Officer Lego questioned him. Officer Schwartz chased Defendant with his gun drawn and yelled that he would shoot if Defendant did not stop. (Tr. 56.) Once Defendant submitted, Officer Lego punched Defendant three times when he was on the ground and administered a "slap stun" technique. (Tr. 34.) Defendant was then handcuffed and placed in the back of Officer Lego's squad car. (Tr. 20.) Both officers testified that at this point Defendant was not free to leave. (Tr. 36, 57.) Because Defendant was restrained and not free to leave, he was in custody at the time Officer Lego questioned him. *See Miranda*, 384 U.S. at 467-68; *Keohane*, 516 U.S. at 112.

As Officer Lego did not provide Defendant with a *Miranda* warning (Tr. 37), Defendant's statements must be suppressed if the Court finds that Officer Lego interrogated Defendant, as that term is defined in the *Miranda* jurisprudence. The Government contends that Officer Lego asked questions merely to confirm Defendant's identity, and therefore no *Miranda* warning was required. (*See* ECF No. 32 at 14.)

"It is well-settled that routine biographical data is exempted from *Miranda*'s coverage." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *see Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). "A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391–92 (8th Cir. 1985). If, however,

the government agent "should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged," the question will be subject to scrutiny. *Id.*; *see Muniz*, 496 U.S. at 602 n. 14 (holding that, during booking procedures, government agents may not ask questions "that are designed to elicit incriminatory admissions"); *United States v. Robinson*, 441 F. Supp. 2d 1029, 1043 (D. Minn. 2006); *see also United States v. Scott,* 270 F.3d 30, 44 (1st Cir. 2001) (determining that questions about age and residence were interrogation not fitting routine booking exception because officer knew answers would likely produce inculpatory information), *cert. denied* 535 U.S. 1007 (2002); *United States v. Henley*, 984 F.2d 1040, 1042–43 (9th Cir. 1993) (holding that an officer asking whether a suspect owned a vehicle was interrogation when officer had reason to believe the vehicle was involved in illegal activity).

Officer Lego testified that he asked Defendant general questions, including his name, date of birth, and address, in order to verify his identity. (Tr. 21.) The Court finds that these questions qualify as "routine biological data" and are exempt from *Miranda*'s coverage. *See Brown*, 101 F.3d at 1274.

Officer Lego then used this information to look Defendant up on the Department of Vehicle Services website. When Officer Lego looked him up, he learned that Defendant was a registered sex offender and that he was registered to an address different than the one he had provided. (Tr. 21.) At this point, Officer Lego testified that he continued to ask Defendant questions regarding his address. (Tr. 36.) Officer Lego testified that he knew when he asked these questions that Defendant was potentially violating the law for failing to properly register. (Tr. 36.) He also testified that he knew Defendant might incriminate himself in response to

11

questioning. (Tr. 36.) The Court finds that while questions regarding a suspect's address will usually fall within the biographical questions exception to *Miranda*, in this case Officer Lego's continued questioning after he learned Defendant was a sex offender were designed to elicit incriminatory admissions from Defendant. The questions therefore constituted interrogation under *Innis*. Because Defendant was subjected to custodial interrogation without receiving a *Miranda* warning, Defendant's responses to Officer Lego's questions after Officer Lego learned that Defendant was a registered sex offender should be suppressed.

## III.   RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1) Defendant's Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 20) be **DENIED**; and

2) Defendant's Pretrial Motion to Suppress Statements (ECF No. 21) be **GRANTED, in part,** and **DENIED, in part,** as follows:

a) To the extent Defendant seeks to suppress statements made to Officer Schwartz, the motion should be **GRANTED**.

b) To the extent Defendant seeks to suppress statements made to Officer Lego, the motion should be **DENIED** with regard to biographical statements made before Officer Lego learned Defendant was a registered sex offender. The motion should be **GRANTED** with regard to statements made after Officer Lego learned Defendant was a registered sex offender.

DATED: December 21, 2010                              *S/ Franklin L. Noel*
                                                      FRANKLIN L. NOEL
                                                      United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 4, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 4, 2010,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.