1          UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2              10-CR-294 (JNE/FLN)

3   --------------------------------------------------------------

4   United States of America      .

5                                 .  Plaintiff,   **SENTENCING**

6          vs.                    .              July 26, 2011

7   Theodore Stevie Varner        .              Courtroom 12W

8                                 .  Defendant.   Minneapolis, MN

9   --------------------------------------------------------------

10              TRANSCRIPT OF SENTENCING
          BEFORE THE HONORABLE JOAN N. ERICKSEN
11           UNITED STATES DISTRICT COURT JUDGE

12  APPEARANCES:

13  FOR THE GOVERNMENT:

14                      KAREN B. SCHOMMER
                        DEIDRE Y. AANSTAD
15                      Assistant United States Attorney
                        300 South Fourth Street
16                      Suite 600
                        Minneapolis, MN  55415
17

18  FOR THE DEFENDANT:

19                      REGGIE ALIGADA
                        Federal Public Defender
20                      300 South Fourth Street
                        Suite 107
21                      Minneapolis, MN  55415

22  Reported By:        Maria Weinbeck, RMR, FCRR
                        Official Court Reporter
23                      1005 U.S. Courthouse
                        300 South Fourth Street
24                      Minneapolis, Minnesota  55415

25  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.

1                          **P R O C E E D I N G S**

2              THE COURT:  Good morning.  Please be seated.  This

3    is United States versus Varner.  Ms. Schommer, government

4    ready to proceed?

5              MS. SCHOMMER:  Yes, Your Honor.

6              THE COURT:  And Mr. Aligada?

7              MR. ALIGADA:  Yes, Your Honor.  Thank you.

8              THE COURT:  Okay.  Mr. Varner, you're ready to

9    proceed as well?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  All right.  Come on up with your lawyer.

12   Are there any changes or disagreements or anything that we

13   need to discuss in the presentence investigation report?

14             MR. ALIGADA:  There's one remaining objection, but

15   because the parties don't object to the fact of armed career

16   criminal designation, it's irrelevant.  It doesn't need to be

17   resolved, and I've talked to the government, and we both

18   jointly agree on that position.

19             THE COURT:  I don't know what you are -- are you

20   talking about the four points for the drugs?

21             MR. ALIGADA:  That's correct, Your Honor.

22             THE COURT:  Okay.  So for what it's worth, I am not

23   going to give him those four points, but it doesn't actually

24   make any difference because the total offense level is as

25   everybody seems to agree, a 33.

1              So that means that the imprisonment range under the

2      guidelines is 235 to 293 months.  And the criminal history

3      category, of course, is a 6.  The supervised release range is

4      three years to five years.  The fine range is $17,500 to

5      $175,000.  And then there of course has to be a $100 special

6      assessment.

7              Now, there were a couple motions that were made in

8      advance of sentencing, one by the government and one by the

9      defense.  Let me first hear from Ms. Schommer, the government

10     is withdrawing its motion for an upward departure from the 293

11     months; is that true?

12              MS. SCHOMMER:  That's correct, Your Honor.

13              THE COURT:  Okay.  And, Mr. Aligada, there was

14     originally a motion for a new trial based on alleged juror

15     misconduct.  That motion is withdrawn as well?

16              MR. ALIGADA:  That's correct, Your Honor.

17              THE COURT:  All right.  Ms. Schommer, anything from

18     the government before I impose sentence?

19              MS. SCHOMMER:  Yes, Your Honor, if I may stay here.

20              THE COURT:  That's good.

21              MS. SCHOMMER:  While the United States has withdrawn

22     its motion --

23              THE COURT:  Hold on a second.  Mr. Varner, if you

24     want to listen to what the government has to say, I think

25     that's probably a good thing.

```
 1              THE DEFENDANT:  I just need to sit down for a few
 2    minutes.
 3              THE COURT:  Okay.  Well, since the government is
 4    talking anyway, why don't you go back and sit.  Are you going
 5    to be very brief or not?
 6              MS. SCHOMMER:  Very brief, Your Honor.  I mean if
 7    the defendant wants to sit --
 8              THE COURT:  Okay.
 9              MS. SCHOMMER:  -- close to the podium.  I am going
10    to be brief, Your Honor.  Although, the United States is
11    withdrawing its motion for a upward departure, the criminal
12    history nevertheless supports a guideline sentence which is
13    from 235 to --
14              THE COURT:  Hold on just a second.  We'll get the
15    defendant situated here.  Well, he can go over there.  There's
16    already a low microphone for him, if he's going want to talk,
17    Mr. Aligada.  It's right there in front of you.
18              MR. ALIGADA:  Thank you, Your Honor.
19              THE COURT:  But aren't you going to talk first?
20              MR. ALIGADA:  I will, but I can talk with these
21    microphones.
22              THE DEFENDANT:  Can you hear me okay?
23              THE COURT:  Ms. Schommer, go ahead.
24              MS. SCHOMMER:  Thank you, Your Honor.  The
25    defendant's criminal history is extensive.  It's known to the
```

1    Court.  It started when the defendant was approximately 20

2    years of age and has continued until today.

3              The defendant complains in his sentencing position

4    paper that he has serious physical infirmities including a

5    back injury, but he also states that that back injury occurred

6    well before the conduct that brought us here today.  It

7    certainly didn't stop him from committing crime.  It certainly

8    didn't stop him from running from the police, darting in

9    between houses, and jumping over fences trying to get way from

10   them while he possessed a gun.  And I would suggest that his

11   physical impairment now is not a reason to vary downward from

12   the guideline range.

13             The defendant is in the position that he's in

14   because of his own criminal conduct.  That criminal conduct

15   got him 34 criminal history points.  Almost three times the

16   level that he needed just to get at the criminal history

17   category 6.

18             Clearly, the sentences that he's received before

19   have not deterred him from additional criminal conduct.  It's

20   not taught him any respect for the law.  Certainly, hasn't

21   protected the public from the defendant's continuing criminal

22   action, and it hasn't provided just punishment.

23             So the United States would suggest that a sentence

24   within the guideline range between 235 and 293 months is

25   appropriate in this case and would ask for such a sentence.

1          THE COURT:  Thank you.  Mr. Aligada, again, your

2    client seems to want to talk to you.  Do you want to take a

3    minute and consult with him before I hear from you?

4          MR. ALIGADA:  Yes, Your Honor.  Thank you.

5          (Off the record discussion between defendant and

6    defense counsel.)

7          (In open court.)

8          MR. ALIGADA:  Thank you, Your Honor.  May I proceed?

9    Last week, Your Honor, I sent to the Court a letter from

10   Raymond Varner, Mr. Varner's cousin.  In addition, I sent some

11   photographs.  Included was this photograph, which was a color

12   copy, but I hope that the Court can see that in Mr. Varner's

13   hand in the photo is a scissors.

14         THE COURT:  I saw that.

15         MR. ALIGADA:  And what I didn't understand until

16   this morning is that the gentleman who is second to the left

17   is wearing a barber cape.  And the occasion that was being

18   celebrated at the time that this photograph was taken was

19   Mr. Varner beginning a turn around of his life.  He had chosen

20   a profession that he believed deeply in, and that profession

21   was cutting hair.  He went to barber school.  He graduated.

22         And the Court will note that the men in this picture

23   all have incredibly short hair, including the gentleman

24   wearing the cape, and that's because Mr. Varner had just cut

25   each of their hair.

1          THE COURT:  Well, now what about the fellow with the

2    purple hat?  He's got some really long hair sticking out the

3    back.

4          THE DEFENDANT:  That's a girl.

5          MR. ALIGADA:  That's Mr. Varner's daughter, Your

6    Honor, who is a player on the Lynx team.  He did tell me this

7    morning that he had done some work on her dreadlocks, however.

8    So she was included in the ability for Mr. Varner to show his

9    talents.

10          This was an important day for Mr. Varner because

11    there is no dispute that he has significant criminal history,

12    but this was a point in his life where things had begun to

13    turn around.  I recognize that we're here for a different

14    reason.  But the summer of 2010 was a special time because

15    Mr. Varner, as I said, had chosen a profession, was doing what

16    he could to make a difference in people's lives, and that was

17    cutting hair.

18          The presentence report has a very nice paragraph

19    that the writer produced explaining what this new profession

20    meant to Mr. Varner.  And, frankly, the potential that he had

21    to make a difference in people's lives.

22          I bring this fact to the Court's attention because

23    as the Court knows Mr. Varner's history and background, but

24    also his potential for the future are important.  He stands

25    convicted of a crime for which he has to be punished.  There's

1   no question about that.

2          But the recidivist enhancement that comes with armed

3   career criminal provides a significant floor for the Court of

4   180 months and a significant guideline range.  It's my

5   position that the starting point for -- before any departure

6   or variance is appropriately in the 235 to 293 range.  And the

7   basis for that is the balance between the significant criminal

8   history with the potential that I've just talked about, and

9   really the idea that Mr. Varner had internalized in his mind

10  that a change should happen.

11         Now, from that starting point, I've made a motion

12  for a downward departure on the basis of Mr. Varner's health

13  condition.  This is not a variety of health condition that is

14  without documentary backup and medical justification.  The

15  presentence report has a lengthy paragraph that discusses the

16  medical condition that Mr. Varner has.

17         But more importantly for purposes of the legal

18  departure, it describes the effect on his life in a custodial

19  setting.  The Eighth Circuit law on 581.4, which I've detailed

20  in the memorandum, explains these three conditions that have

21  to be met before a departure is appropriate.  And it's my

22  position that all three of those conditions have been met.

23         In addition to the information that I've included in

24  the sentencing memorandum itself, it's clear by what's

25  happened in court today, that Mr. Varner has significant

1   physical impairment, the ability for him to sit and stand.

2   And I will tell the Court from my experience that this has

3   been fairly consistent since I met him and had begun working

4   with him.  It has an impact on him in terms of what happens to

5   him on a daily basis.

6          Lately, Mr. Varner has spent a significant amount of

7   time in bed in the morning because of the pain.  And when we

8   look at the question under 5H1.4 of whether imprisonment would

9   provide more than the normal hardship for him, there's no

10  question that that is true because of this consistent pain

11  that he experiences.

12         There is a second element that discusses both

13  inconvenience and danger.  Inconvenience is a light term to

14  use for what Mr. Varner's daily tasks are like with a cane and

15  a back brace being worn at all times.

16         This Court knows well that federal prisons are a

17  place where other dangerous offenders are housed.  And I

18  credit the Bureau of Prisons in terms of placing people with

19  similar physical impairments and abilities together.  But I

20  believe there will still be significant danger for him because

21  of the lack of mobility.

22         So the final element then is whether there's a

23  substantial present effect on his ability to function.  The

24  PSR bears that out.  As I said, there's a strong paragraph

25  there that explains it.  And you can observe what's happening

1    to Mr. Varner today in terms of his ability to stand for long
2    periods of time.

3              And it's for that reason, Your Honor, that truly
4    from a justice point of view of what the right sentence is to
5    punish him, even if this Court grants the criminal history as
6    a factor to put him within the guidelines, 15 years of
7    remaining in this kind of physical condition when it does not
8    appear that surgery is going to happen.  It does not appear
9    that the strong kind of prescription medication that really
10   blunts the pain is going to happen for fear of addiction.  It
11   means that he'll spend his sentence in pain and significant
12   pain.

13             And so in looking at a term, 15 years is incredibly
14   punitive.  And I think that that factor in balancing
15   everything else matters most in this case.  And I ask for a
16   sentence of 15 years, and I don't do it lightly because of
17   this medical impairment.

18             As far as a designation, Your Honor, understanding
19   what the Bureau of Prisons has to offer, a suitable facility
20   for his medical treatment, I think, is the most important
21   designation request.  But after that, as close to Minnesota as
22   possible.  That leads me to ask for Rochester.  I have no idea
23   whether the bureau will put him there, but I think that it is
24   an appropriate request.  That is all that I have, Your Honor.
25   Thank you.

1          THE COURT:  Thank you.  Just looking here to refresh
2    my memory on the date of the back injury where he was robbed
3    and thrown against --
4          MR. ALIGADA:  February of 2010, Your Honor, is when
5    that event occurred.  And there was medical treatment after
6    that, but the records that we have show medical treatment in
7    August of 2010, prior to his arrest.
8          THE COURT:  Okay.  And then the arrest in this case
9    was?
10          MR. ALIGADA:  September of 2010.
11          THE COURT:  Okay.  And, Mr. Aligada, did you want to
12    address the fact that although he appears not to be able to
13    stand today at the trial, we heard testimony that he ran and
14    jumped and sprinted.
15          MR. ALIGADA:  Yes, and there was also testimony that
16    he fell at least twice, maybe three times.  I think that was a
17    point of dispute, at the end of the chase.  So certainly from,
18    and I included this in the sentencing position, in terms of
19    the physical issues, if the Court will remember there was also
20    some testimony about whether he lost his shoes or not.
21          And so it suggests to me that in the present moment
22    at that time, physical impairment was part of what happened in
23    the chase that ultimately lead in him being arrested and
24    apprehended.  He did -- I mean an important part of the
25    testimony was falling in the alley on his tailbone and coming

1   over a fence, and then falling again.  And so it's my position

2   that physical impairment was part of it then.

3          I don't remember much testimony about how fast he

4   was running.

5          THE COURT:  Well, the police officer testified that

6   he was pretty much running, it seemed flat out, and your

7   client jumped over a fence.  I mean he jumped over a fence and

8   then fell on his tailbone is my recollection of the testimony.

9   So has anything happened?  Has he had another injury between

10  then and now?  He can't sit, and he did not seem to be in this

11  much distress during the trial.

12         MR. ALIGADA:  I will tell the Court that -- I'm

13  trying to be careful about privilege here -- but I will tell

14  the Court that his back issues made it difficult for him to

15  sit at trial for the extended periods of time that he did.

16  And as you can see today, he's preferring to sit.

17         The question, of course, for this Court is in a

18  penal institution, will he be able to sit or lie down all day?

19  I think the answer to that in general is no, unless they make

20  special accommodations for him.

21         But the presentence report includes information that

22  even sitting can be painful for him and create a numbing

23  sensation and throbbing in his legs.

24         THE COURT:  Now, he's been in custody for going on a

25  year now?

1            MR. ALIGADA:  That's correct.

2            THE COURT:  And have there been any -- I don't have

3    any medical reports from the jail where he's been indicating

4    that they haven't been able to accommodate his medical

5    situation.  They've got him on a brace and some non-narcotic

6    pain medications.  You were just going to direct me to a

7    particular paragraph?

8            MR. ALIGADA:  That's right.  I'm sorry, Your Honor,

9    to interrupt.  Page 20 of the PSR at paragraph 70 discusses

10   physical condition.  And I think it's important to note that

11   in paragraph 70, there is a recommendation from a provider at

12   Midwest Spine Institute that surgery is recommended.  Let me

13   make sure that I'm correct about this.

14           THE COURT:  Well, I can't really understand it.  It

15   says, "noted anterior posterior spinal fusion with

16   instrumentation and decompression at L4-5."  I don't think

17   that's a recommendation.  I think that's a diagnosis.

18           MR. ALIGADA:  That's correct.  And then there's a

19   Percocet prescription in paragraph 70.  And then the next

20   paragraph explains that at the jail, there was simply an

21   authorization for a multivitamin and no medication.  And I can

22   proffer to the Court that this medical issue has been

23   consistent.  I'm holding --

24           THE COURT:  It says here in paragraph 72 that he

25   chose elective surgery consisting laminectomy and fusion

1    surgery with interbody fusion.

2              MR. ALIGADA:  This is prior to his arrest.  So in

3    August of 2010 prior to his arrest, he had been seen at

4    Regions Hospital, and an elective surgery was chosen by him.

5    The provider provided him the option, and he chose elective

6    surgery but that surgery did not happen prior to his arrest.

7    So that's kind of the moment in time of where he was

8    physically before the arrest happened.

9              To be honest with you, Your Honor, I don't know

10   whether the chase and falling on his tailbone exacerbated that

11   injury, but in my mind and the records back up that there were

12   serious back issues prior to that.

13             This, what I'm holding now, Your Honor, is his

14   medical file from Anoka.  And this is, I don't know, about 100

15   pages.  And I do have the medical referral from Midwest Spine

16   Institute, which is my understanding did recommend the

17   surgery.

18             THE COURT:  Do you have that?

19             MR. ALIGADA:  I do.

20             THE COURT:  If you wouldn't mind just giving me that

21   stack of medical information and I'll take a look at it.

22             MR. ALIGADA:  I will do that, Your Honor.  The

23   records to which I've just directed the Court are the records

24   referenced in PSR paragraph 70, in terms of the treatment that

25   he received from Midwest Spine Institute.

1    THE COURT:  I can't find a date on that.  That's

2  from -- let's see, I can see all of these dates when it was

3  printed and received but.

4    MR. ALIGADA:  Right.  Again, I believe that

5  corresponds with February 3, 2010.  2011, I'm sorry, in

6  paragraph 70.

7    THE COURT:  You think this surgery scheduling

8  form -- Mr. Varner, I'm going to give you some time to talk to

9  your lawyer now because I want to make sure that you --

10    You keep talking while everybody else is talking and

11  I want to make sure that you have an opportunity to listen to

12  what is being said too, so go ahead and talk to your lawyer

13  now, if you want to.

14    (Off the record discussion between defense counsel

15  and defendant.)

16    (In open court.)

17    MR. ALIGADA:  Thank you for that time, Your Honor.

18    THE COURT:  So he saw Dr. Alper, it looks like

19  pretty frequently when he was in Anoka County.

20    MR. ALIGADA:  I believe -- let me talk to

21  Mr. Varner.

22    (Off the record discussion between defendant and

23  defense counsel.)

24    (In open court.)

25    MR. ALIGADA:  It's my understanding that Dr. Alper

1   is the doctor at Anoka County, and he's retired now.  One of

2   the issues that arose, in terms of medical care, was that this

3   condition is specialized enough that specialty care was

4   important enough for him to receive outside of the facility.

5           So I believe that some of the records that the Court

6   is seeing is the local doctor working with Anoka County

7   commenting back and forth on future treatment options, based

8   on what specialists said.

9           THE COURT:  Well, all right.  There's a lot here.

10  Well, here just last month, June, it looks like there was an

11  observation.  There's a record of your client expressing some

12  sort of concern.  It almost doesn't look complete about his

13  medical situation and the institution saying that they

14  observed him doing exercises.  And he's saying he did push

15  ups, which is his upper body, and then asking for a response.

16          And the response in the record says, "you've been

17  observed riding exercise bike and doing pushups with your legs

18  up on the sink elevated.  If are you in so much pain, you

19  should probably stop doing these exercises."  Dated June 6,

20  2011, at 8 a.m. by some nurse.

21          MR. ALIGADA:  One of the issues that has continually

22  arisen is the question of what Mr. Varner should be doing to

23  maintain back strength, given the fact that he has throbbing

24  in the legs, and the ability to use his upper body when his

25  legs aren't working.

1          Mr. Varner has chosen to do some exercises.  We've

2     gone around in circles about whether correctional folks

3     observing him in that environment have the ability to comment

4     on what his true medical condition is from the standpoint of

5     ongoing pain.

6          The issue that I'm focusing on here is what will his

7     experience in a custodial setting be like for the next so many

8     years?  And I think that the medical records bear out that

9     he's in significant pain, has been for some time.  And that in

10    a correctional setting, the options for him are limited, as

11    far as surgery goes.  So that even if surgery were able to

12    mend him, it's not an option that it appears is going to be

13    there for him.

14         My experience is that in terms of narcotic treatment

15    of pain, that's not something that correctional institutions

16    do for a legitimate medical reason that their fear of

17    addiction and what happens to medications inside a facility.

18    Realistically means that Mr. Varner, I think, is limited to

19    over the counter prescriptions for pain management.

20         The issue that I'm trying to just make known here is

21    that his future is going to be one of low function in terms of

22    physical ability, one of constant pain, and that makes it more

23    punitive for him.

24         The doctors that specialize in his care and the

25    doctors at Anoka County, I can tell you from months and months

1    of dealing with this, have gone back and forth about what the

2    right treatment is.  The marshals have gotten involved and

3    have been very responsive to me in terms of trying to figure

4    out what should happen.

5            But it's clear in the end that no will happen, and

6    that no pain management more significant than over the counter

7    drugs will be his future.  I can't comment on the Bureau of

8    Prisons, but I can't imagine that it's going to be much

9    different.

10           And so my concern today in making this downward

11   departure motion is I don't want to beat a dead horse here.

12   But is the nature of what he will experience from a punitive

13   point of view and how he will be -- how he will feel from the

14   punishment point of view in custody.  That is the issue.

15           THE COURT:  Okay.  There's no -- looking through

16   your -- I'm not going to find a doctor's recommendation that

17   he do those pushups with his legs elevated on a sink, am I?

18           MR. ALIGADA:  I believe there was a recommendation

19   of physical therapy, but I was able to talk with Glen Legus

20   from the marshal, that he get an exercise book to assist him

21   in that way.

22           THE COURT:  I did see a reference here from the same

23   person.  It looked like the same person saying, "get this back

24   book."

25           MR. ALIGADA:  Right.

1          THE COURT:  It's a back --

2          MR. ALIGADA:  Essentially, the position that Mr.

3   Varner has been in is if I can't have surgery, and I can't

4   have pain management medication stronger than over the

5   counter, then I have to have some other option here to make my

6   experience less painful and to be able to strengthen myself.

7   And so that's the nature of the exercises.

8          What my concern is is that --

9          THE COURT:  We probably -- and then just one last --

10  I interrupted you because I thought you were going to say the

11  same thing you've been saying which is about his experience in

12  prison, but if it was something different.

13         MR. ALIGADA:  It's just this slight shade of

14  difference.  The medical records show a chronic back problem.

15         THE COURT:  No doubt.

16         MR. ALIGADA:  The back and forth inside of a

17  correctional institution from people who are concerned about

18  institutional safety but aren't licensed medical providers, at

19  least some of the observational stuff causes me concern, as

20  far as diagnosing future treatment and future options and what

21  he's cable of doing.

22         And I've gone in circles about this for almost a

23  year now.  The question is whether to rely on the medical

24  providers, which are affirmed in the presentence report, or to

25  rely on observations in a correctional setting that may have

 1 | less to do with therapeutic options.  That's my concern, and
 2 | so I don't rely on them.  I don't think the Court should as
 3 | well.
 4 |         Well, it seems clear that -- well, it seems clear,
 5 | it's beyond doubt that he's got some issues with the L-4/5,
 6 | and there's no question in my mind that that causes him pain,
 7 | and that that is going to be something that will have to be
 8 | addressed and managed.
 9 |         MR. ALIGADA:  I have a binder clip for that.
10 |         THE COURT:  I'm going to give these back to you
11 | unless you feel some need to make them part of the record.
12 |         MR. ALIGADA:  No, Your Honor.
13 |         THE COURT:  It's also beyond question that the
14 | impact that the back problem has on his ability to be mobile
15 | seems to vary from time to time.  To look at him today, he can
16 | hardly stand, and yet he is able to do these pushups with his
17 | legs elevated on the sink.  He was able to run.  He was able
18 | to jump.
19 |         I see from the pictures, that he's able to stand and
20 | hold children.  And there's no brace there.  He's able to
21 | squat, lean over, bending his back, and then -- so, I mean
22 | he's not immobilized, but it's beyond doubt that he's not in
23 | fact immobilized.  He does experience pain, and that is backed
24 | up by the medical records.  So that's how I see the state of
25 | the record with respect to the back injury.

1          So setting aside the back injury, is there any other

2     area of comment that you want to make before I hear from your

3     client, if he wants to talk?

4          MR. ALIGADA:  From a 3553 point of view, Your Honor,

5     I would just reference Raymond Varner's letter.  It does an

6     excellent job of explaining the difficult upbringing that

7     Mr. Varner had.  And I think as Ray puts it, that as children,

8     they learned rules of the game which undoubtedly are not the

9     way that citizens should conduct their lives.  But at age 8

10    and 9, that's how things were taught to them.

11         So Mr. Varner is constantly struggling to recover

12    from that life and to end where I started.  The photograph of

13    him with the scissors is that full circle of really trying to

14    turn it around.  And when Mr. Varner is finished with his

15    sentence, that is something that he intends to return to.

16    Thank you.

17         THE COURT:  Thank you.  Mr. Varner, this is your

18    chance to speak in your own behalf, if you wish to do so,

19    before I impose sentence.

20         THE DEFENDANT:  Thank you.  I really ain't -- I got

21    a lot to say, but I really don't want to be rude, but.

22         THE COURT:  Be what?

23         THE DEFENDANT:  I have a lot I would like to say but

24    I don't for you to feel like I'm being rude with you or with

25    the Courts with the situation that took place with me with all

1  of this.

2          I don't have no reason to lie about anything.  I'm a

3  man.  You all seen my -- you looked at my record.  I've got

4  all of these felony convictions and points because I took a

5  plea bargain for me because I own up to my stuff.  That's what

6  men do.  Where I'm from, you accept what you do.  If you do

7  it, you accept the consequences.  This ain't something that I

8  done.

9          So I lost a lot that I worked really hard for coming

10  from where I came from, and now I'm sitting to where I have

11  really -- I don't have nothing, not even be able to really

12  move around or nothing, you know.  And this is not fair to me

13  or my family, my kids.  You know.

14          Like he said, my daughter plays ball for the Lynx.

15  I think I went to one game last year because I wasn't -- they

16  say you can't fly.  You just got out of prison.  You can't

17  fly.  They want you clear for a year or some stuff.  Then I

18  guess the chance a year come around, I can move around and

19  spend more time with my kids.  Now, I'm in here.  I understand

20  that the police --

21          MR. ALIGADA:  May I have a moment, Your Honor?

22          THE DEFENDANT:  -- the marshals.

23          MR. ALIGADA:  May I have a moment to speak with

24  Mr. Varner?

25          THE COURT:  Sure.

1            (Off the record discussion between the defendant and

2     the defense counsel.)

3            MR. ALIGADA:   Thank you.

4            THE DEFENDANT:   That's it.   That's all I'm going to

5     say.   I appreciate you taking time and cooperation and

6     patience with me during this situation that we've been went

7     through since I've been in your courtroom.

8            THE COURT:   You don't have to say that.   And if

9     there's more that you want to say, I'm not going anywhere.   I

10    guess you're not going anywhere, not to be --

11           THE DEFENDANT:   No, that's, that's, that's good

12    enough.

13           THE COURT:   Okay.   It seems that you've been

14    sometimes you've pled guilty, and sometimes you've gone to

15    trial on some of these priors.   And the points add up to what

16    they add up to.   But you were done, right, Mr. Varner?   You've

17    said everything you've wanted to say?

18           THE DEFENDANT:   Yeah, I had to say something else

19    but I forgot though.

20           MR. ALIGADA:   It's up to you.

21           THE DEFENDANT:   I can't remember, man.   Just one

22    question because it's been puzzling me because I've been doing

23    some research on myself with my case that I'm in here for.   I

24    asked my lawyer, but I was asking can I know if get it in

25    writing or something, but he really doesn't really say.

1          But I was wondering how far do you go back on the

2     statutes for like career criminals, because I read in this,

3     "Busted By The Fed" books that they only go back 15 years.

4     But from my understanding from my lawyer, they can go back as

5     far as they want to.

6          THE COURT:  There's an actual book called, "Busted

7     By The Fed?"

8          THE DEFENDANT:  Yeah.

9          THE COURT:  Is it good?  Should I read it?

10          THE DEFENDANT:  I think it kind of lightened me up

11     on a little stuff with what's going on with me right now.  But

12     one part it says, "see career criminal for the sentencing

13     thing."  And back there, it says they can't go past 15 years.

14     So I asked my lawyer, and he really is saying the same thing,

15     but so now I'm asking you.  And that's basically really the

16     most important question that I would like to ask and say

17     today.

18          THE COURT:  Okay.  Mr. Aligada, do you know what

19     he's talking about?

20          MR. ALIGADA:  I do, Your Honor.  Armed career

21     criminal is predicate offenses.  And Mr. Varner and I have

22     discussed how far back predicate offenses can go to count.

23     And the distinction between career offender designation --

24          THE COURT:  For the guidelines.

25          MR. ALIGADA:  -- for the guideline purposes, and for

1    the career guideline enhancement versus the statutory

2    component of ACCA and the age of convictions.  It's my

3    understanding from researching the law and prior cases, that

4    ACCA predicates have no time bar going backward.  924E does

5    not provide a limitation on how far back you can go.

6              Because one of Mr. Varner's early convictions that

7    is a predicate is old enough that it would age out for

8    purposes of something like criminal history points or career,

9    but not for ACCA.  And so I've explained that to him, and he

10   wants to check a second source with the Court.  I respect

11   that.

12             THE COURT:  When did he get out after that?  After

13   that oldest?

14             MR. ALIGADA:  I believe it was a 1989 conviction.

15   Paragraph 27 of the presentence report includes a notation

16   that an aggravated robbery offense from Ramsey County was a

17   predicate under 4B1.4.  And, frankly, under 924E as well.  He

18   was discharged from custody on 1/9 of 1994.

19             THE COURT:  So '94, 2004, 2009, so that would be

20   just outside the 15 years.

21             MR. ALIGADA:  Correct.

22             THE COURT:  So that's his concern.

23             MR. ALIGADA:  It's a legitimate question.

24             THE COURT:  Yes, that is a legitimate question.

25   I've got get ahold of this book.  There's probably all kinds

1   of stuff in there that would explain why people make some of

2   the arguments that they do.  Who wrote that book?  Is that a

3   reliable person who wrote that book?

4           THE DEFENDANT:  I think his name is something

5   Williams or something.  Cooper Williams?

6           THE COURT:  The name doesn't mean anything to me,

7   but is he a lawyer or is he an inmate or what the heck is he?

8   I suppose he could be both.

9           THE DEFENDANT:  He was a paralegal or something, and

10  got that when he was in the feds, and then he wrote the book.

11          THE COURT:  Okay.  Go ahead.

12          MR. ALIGADA:  Just to make a factual clarification

13  that Mr. Varner just brought to my attention.  The Court

14  referenced earlier standing, sitting, squatting.  This

15  photograph was taken after the point when he was robbed.  But

16  the rest of the photographs, the one where he is squatting.

17  It's hard to tell in this photograph and a couple of others

18  where he is standing was prior to the robbery.  Just for

19  factual clarification.

20          THE COURT:  Okay.  I don't know what they give you

21  for books in there, and I am not qualified to give you legal

22  advice.

23          THE DEFENDANT:  Yes, ma'am.

24          THE COURT:  I am paid to make legal decisions, but I

25  am absolutely not allowed to give people legal advice.  So

1   your lawyer is here.

2                  THE DEFENDANT:  Yes, ma'am.

3                  THE COURT:  And I'm going to just point out some

4   parts of the statute and parts of the guidelines in the

5   application that might be helpful to you in your discussions

6   with him.  But we're clear on that I can't give you any legal

7   advice, right?

8                  THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.

9                  THE COURT:  So the statute that makes you an armed

10  career criminal, this is this 924E that your lawyer was

11  talking about.

12                 THE DEFENDANT:  I don't think that was in the book

13  as to what it was.

14                 THE COURT:  Yeah, you know what?  That book sounds

15  like not really an authoritative source to me.  People can

16  write whatever they want so, I don't know.  But anyway,

17  whatever that book is, it does not have the force of law.

18                 THE DEFENDANT:  Yes, ma'am.

19                 THE COURT:  This is where the -- this book here,

20  this light green one is the Criminal Code.  It's the 2011

21  printing of the Criminal Code.  But it's everywhere.

22                 So this is 924E.  And it talks about the prior

23  offenses of violent felonies or serious drug offenses.  And

24  the only reference to 15 years there is the mandatory minimum

25  sentence of 15 years.  So you've got no -- there is no age

```
 1    limit that is spelled out in this section.

 2              THE DEFENDANT:  Yes, ma'am.

 3              THE COURT:  So that's probably what your lawyer was

 4    talking about for that.  So that's right there on page 725.

 5              Then there are the guidelines.  And this career

 6    offender guideline is section 4B1.2.  And the most current

 7    version of the guidelines is the bright green book, but this

 8    part hasn't changed.

 9              And 4B1.2 talks about what a crime of violence

10    means, and that includes crimes that have the attempted use,

11    threatened use of physical force against another or burglary

12    or controlled substances, all of which are defined.

13              Now, there's nothing in there about a time limit.

14    But under normal circumstances, there is a time limit to how

15    old a criminal conviction can be when you're going to

16    calculate somebody's criminal history.

17              THE DEFENDANT:  Yes, ma'am.

18              THE COURT:  But -- I just saw this application note

19    that said that that doesn't count for this.  Now, I can't find

20    it again.

21              MS. SCHOMMER:  I believe it's the application note

22    to 4B1.4.

23              THE COURT:  There we are.  I just had it.

24              Mr. Aligada, would you show him, we've got 4B1.4,

25    and go to the application note 1, so the top of page 396
```

```
 1    there.  And I'm going to be in the first paragraph there, in
 2    the middle of the first paragraph.  Do you see where it says,
 3    "It is to be noted that --"
 4              THE DEFENDANT:  Yes, ma'am.
 5              THE COURT:  "It is to be noted that the definitions
 6    of violent felony and serious drug offense in 924E2 are not
 7    identical to the definitions of crime of violence and
 8    controlled substance offense used in the career offender."
 9              THE DEFENDANT:  Okay.
10              THE COURT:  But then look at next.  It says, "nor
11    are the time periods for the counting of prior sentences under
12    4A1.2, which is definitions and instructions for computing
13    criminal history applicable to the determination of whether a
14    defendant is subject to an enhanced sentence under 924E."
15              THE DEFENDANT:  Okay.
16              THE COURT:  So there is a time limit for criminal
17    history, but then there are special provisions for the career
18    offender and armed career criminal.  So you do your own
19    research, and you talk to your own lawyer.  But that's my
20    basis for not excluding that '94 conviction, so I say that by
21    way of explanation for my decision and not by way of legal
22    advice to you.
23              THE DEFENDANT:  Yes, ma'am.  Thank you.
24              THE COURT:  Well, now I have to determine what to do
25    in terms of a sentence.  Now, I know that you had a very
```

1   difficult and cruel childhood.  I know that following that,

2   you committed an awful lot of crimes.  And if the way that you

3   were raised gets you back out on the street faster, the

4   criminal history here shows that that's not safe for the

5   community.  Because for whatever reason, and it seems likely

6   that it is related to the fact that you had such a cruel

7   upbringing, what that has done to you has made you commit all

8   of these crimes.

9           Are you going to turn over a new leaf?  I think

10  that's a good possibility, and having a skill and being so

11  persistent in it.  And I liked reading that you actually

12  sometimes would pay the bus fare, the transportation fare for

13  people to come and let you work on their hair.

14          So that's a, you know, it's a possibility.  But what

15  you did with your upbringing so far is not something that

16  weighs in your favor.  It weighs in favor of making sure that

17  we protect the public from, you know, what happened.  Yes,

18  sir?

19          THE DEFENDANT:  I learned from all this, right?  I

20  know I didn't get to be the person that I am overnight.  And

21  so it took me a long time to become the person that I am right

22  now.  So to keep moving forward, that's where I'm going to

23  keep my mind set at.  That's why I do here, because if you

24  feel good.  If you look good, you feel good.  You want to do

25  great.

1           THE COURT:  Yep, I saw that.  That's the part of the

2    joy that you get out of the hair cutting.

3           THE DEFENDANT:  So that's something that I never

4    received when I was growing up.  So now since I found

5    something that makes me happy, that keeps me happy, I share it

6    with other people.  That was the whole thing about my life

7    turn around.  Whatever happened before then, I came somewhere

8    else, and now I found something different.

9           THE COURT:  Yep, yep, and that happens to people.

10   And for a lot of people, it sticks.  You know, some people

11   have a conversion, and they turn their life around, and it

12   sticks for a while, and then they back slide.  But sometimes

13   it really does, especially if somebody is well into adulthood,

14   as you are, it really can stick.  You just don't know for sure

15   whether it's going to or not, but it can.

16          And your cousin wrote this very nice letter for you,

17   and talked about how you don't want to perpetuate the

18   fatherless situation that you had.  But I think you've got a

19   bunch of kids, don't you?

20          THE DEFENDANT:  Yep.

21          THE COURT:  You've got six children.  Determining

22   what the overall range, you know, kind of what the range is of

23   appropriate sentences isn't something that judges do

24   completely one-on-one each time, and pick a number out of thin

25   air.

1           We've got a Guideline Commission that looks at

2      people's history, what's likely to happen, what are good

3      indications of what might happen in the future.  They do

4      whatever they all they do, and they come out with these

5      sentencing guidelines.

6           And the sentencing guidelines for you are guidelines

7      that are -- there's nothing about them that's not appropriate

8      to your situation.  It takes account of your criminal history.

9      It takes account of the fact that you had this gun.  It takes

10     account of the, you know, you're kind of on paper situation.

11          So is there anything that should give you a higher

12     sentence?  The government has withdrawn its request that you

13     get a sentence higher than 293 months.  I don't think I'd give

14     you a sentence of higher than 293 months any way even if they

15     asked for it, because that would be, I just think that would

16     be more than you really need.  Because you are 41.  I'm

17     thinking that you're 41.  Maybe you're not 41 anymore.

18               MR. ALIGADA:  42, Your Honor.

19               THE COURT:  42 now.  Anyway, I just think that's too

20     much.  The only listed factor that gives me pause about giving

21     you a sentence below the guidelines, and that would require my

22     deciding that the bottom of the guidelines would be more than

23     was necessary for you, is this physical issue that we spent so

24     much time talking about.

25          And I can't tell really what you are physically able

1    to do, and what you're physically not able to do.  We do have

2    people in the institutions who literally can't walk, and they

3    can't do physical exercise, whether they're in pain or not.

4            Now, the BOP, the Bureau of Prisons, is going to be

5    in a better position to help you with your back problem than

6    the county jail was.  So the fact that the county jail dealt

7    with your problem in the way that they did, not that that was

8    bad or inadequate, but not necessarily something that you

9    would want to keep doing for the next many years.  So the

10   Bureau of Prisons will be in a better position to do that.

11           And your medical situation isn't so far outside the

12   norm that that would be a reason to give you a sentence that

13   is not within the range that otherwise would be appropriate

14   for you.

15           And so something in the neighborhood of about, you

16   know, probably 250 months is what I would be thinking.  But I

17   want to get you out in the shortest period of time consistent

18   with the appropriate punishment and all of the factors that go

19   into those not only the guidelines but also looking at the

20   seriousness of the offense and so on.

21           So it seems to me that going to the very bottom of

22   the guideline range is something that I can do, and that

23   that's not going to be more time than you earned yourself by

24   the commission of this crime.

25           I recognize that's a long time.  And there's an

1    argument to be made that all sentences, in a way, in this

2    country are too long.  But that's not a philosophical debate

3    to be had for today.

4              So I'm going to sentence you to the bottom of the

5    guideline range which is to say 235 months.  And then you are

6    going to be on supervised release for a period of five years

7    after you get out.  And the conditions will all be explained

8    and read to you separately.

9              But they are that you have to report to the U.S.

10   Probation and Pretrial Services Office in the district where

11   you are released within 72 hours of release from custody.

12             You may not commit any crimes:  Federal, state, or

13   local.

14             You may not illegally possess a controlled

15   substance.  You have to refrain from my unlawful use of a

16   controlled substance and submit to one drug test within 15

17   days of release from imprisonment, and at least two periodic

18   drug tests thereafter as determined by the Court.

19             And let me just pause on that, and what I'm going to

20   say here for a moment is not part of the conditions of

21   supervised release.  But I know when you were caught, and I

22   didn't give you those four points, but you had a prescription

23   for OxyContin or some kind of a strong medication.

24             THE DEFENDANT:  Percocet.

25             THE COURT:  Was it Percocet?  Because what you had

```
 1    on you was --
 2              THE DEFENDANT:  It's Percocet.  I don't know what --
 3    it's Percocet.  That's the only thing that the hospital
 4    prescribed for me and gave to me.
 5              THE COURT:  Okay.  But there were two different
 6    kinds of drugs in that container that you had on you when the
 7    police caught you back in September of 2010.  So what I'm
 8    saying is that I've got this condition here about not
 9    illegally possessing a controlled substance, because you'll
10    probably have, maybe you'll have surgery, and the pain will go
11    away.
12              But if you have a prescription, you can't be
13    carrying something that's similar to that prescription or you
14    could be in violation of this condition of supervised release.
15    So that's just kind of an aside on that.
16              Then continuing on with the conditions:  You may not
17    possess a firearm.  No surprise there.  No firearm,
18    ammunition, destructive device, or other dangerous weapon.
19    And you have to cooperate in the collection of DNA as directed
20    by the probation officer.  I know that kind of doesn't make
21    sense, but that's a requirement for basically all people who
22    are convicted of a federal felony.
23              You have to abide by the standard conditions of
24    supervised release that have been adopted by the Court
25    including the following special conditions:
```

1          You have to participate in a program for substance

2     abuse as approved by the probation officer.  And that program

3     may include testing and inpatient or outpatient treatment,

4     counseling, or a support group.  I'm thinking should I make

5     you pay for that pursuant to the Court's program?  And I'm

6     going to say no.  I'm not going to make you pay on the

7     co-payment plan.

8          If you're not employed at a regular lawful

9     occupation as deemed appropriate by the probation officer, you

10    may be required to perform up to 20 hours of community service

11    per week until you are employed and to participate in

12    training, counseling, daily job searches or other employment

13    related activities, as directed by the probation officer.

14          And then the final condition is that you are to

15    submit your person, residence, office, vehicle or an area

16    under your control to a search conducted by a U.S. probation

17    officer or a supervised designee at a reasonable time and in a

18    reasonable manner, based on reasonable suspicion of contraband

19    or evidence of a supervision violation.  And you are to warn

20    other residents or third parties that the premises and areas

21    under your control may be subject to searches pursuant to this

22    condition.

23          So those are the conditions of supervision.  As you

24    know, I do have to impose a special assessment, and that is a

25    $100 special assessment, because that is the single count of

1   conviction.

2          I'll make some recommendations to the Bureau of

3   Prisons, but before I do that, I want to make sure that I

4   don't forget to let you know that any appeal would have to be

5   noted within 14 days of today's date.  If you cannot afford a

6   lawyer on appeal, then you have one appointed to represent you

7   at no cost.

8          I will recommend to the Bureau of Prisons that you

9   be placed in a medical facility, at least initially for

10  evaluation, and that you at all times during your

11  incarceration be placed in a facility that is able to

12  accommodate your back problem.  I will specifically recommend

13  the Rochester Institution in Minnesota.

14          THE DEFENDANT:  Thank you.

15          THE COURT:  And the reason for that is that it's

16  going to be close to your family, and you'll be able to

17  maintain those connections, and that will help you for when

18  you get out.  It will also help them.

19          And it is also an institution that we know for a

20  fact is going to be able to take care of your problems.  There

21  are at least one other federal medical institution that would

22  be very, very supreme in being able to take care of your

23  medical problem, but they're not to put you someplace where

24  your medical needs won't be met.

25          Now, Ms. Schommer, there's a forfeiture provision,

1    right?

2           MS. SCHOMMER:  There is, Your Honor.  And I believe

3    I have to go back and look through the file, but I believe

4    there is a preliminary order entered by the Court for that

5    issue.

6           THE COURT:  Okay.  And that's made final.

7           Mr. Aligada, is there anything else?

8           MR. ALIGADA:  If I could just consult with

9    Mr. Varner for a second.

10          THE COURT:  Sure.

11          (Off the record discussion between defendant and

12   defense counsel.)

13          MS. SCHOMMER:  Your Honor, that preliminary

14   forfeiture was filed on March 21, 2007.

15          MR. ALIGADA:  Nothing further, Your Honor.

16          THE COURT:  All right.  This is unrelated to

17   Mr. Varner, but this massacre in Norway is on everybody's

18   mind, and the maximum term of imprisonment in Norway, did you

19   see is what, 20 years?  21 years?

20          MR. ALIGADA:  I didn't realize it was that low.

21          THE COURT:  So I think they have to get out in 17.

22   Now, that I base on another non-authoritative legal source

23   which is the radio.  But we're not living in Norway.

24          Well, that's everything.  And, Mr. Varner, I know

25   that you're not a bad person.  But, you know, there's the

1  crime, and there's the run up to the crime, and there's the

2  punishment.  So I hope, and I have some confidence that you

3  are going to take it from here and you're going to be okay.

4  But that's about it.  That's about all we can do here.  So we

5  are in recess.  Thank you.

6         (End of proceedings.)

7

8                              * * *

9

10

11

12

13

14                           -oOo-

15      I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above matter.

17

18                         Maria Weinbeck, RMR, FCRR

19                         Official Court Reporter

20

21

22

23

24

25