UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| THEODORE STEVIE VARNER | ) | |
| Movant | ) | |
| | ) | |
| VS. | ) | No. |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| Respondent | ) | |

RECEIVED BY MAIL
AUG 2 6 2013
CLERK, US DISTRICT COURT
MINNEAPOLIS, MN

DECLARATION OF THEODORE STEVIE VARNER IN SUPPORT OF MOTION FOR RELIEF UNDER 28 U.S.C. §2255

I Theodore Stevie Varner, being competent to make this declaration and having personal knowledge of the facts stated herein do herby state, declare and depose pursuant to 28 U.S.C. §1746 under penalty of perjury that:

1) I am the defendant/movant in the above-styled case.

2) In Wednesday, 22, September, 2010, during the morning hours I was walking from my barber shop when I saw a police cruiser approaching me at a rapid rate of speed.

3) I continued walking until a police officer yelled for me to get on the ground.

4) When I turned around, there was a police officer with his gun in his hand pointing it at me and yelling for me to get on the ground.

5) I stopped walking and asked the officer what was going on and he told me to get on the ground.

6) At that time another officer approached me with his gun out and I told them that my back was messed up so I couldn't

-1-

SCANNED
AUG 2 6 2013
U.S. DISTRICT COURT MPLS

get on the ground very fast.

7) The second officer then rushed me and put his knee in my back and hit me in the face several times with his fist then roughly forced me in handcuffs.

8) I repeatedly asked the officers what I had done but they just said "you know what this is."

9) The officers then searched me and took my cell phone w/case and my credit card, my medications, then put me in the back seat of a patrol car and took me to jail.

10) After arriving at the jail, the officers took my clothes and my shoes then booked me into the jail.

11) At no time was I read my Miranda warnings or told why I was being arrested.

12) After I was booked into the Law Enforcement Center, I was told that I was being charged with possession of a gun and drugs.

13) I told the officer that I didn't know anything about a gun. medications were my personal medications for my back.

14) I also told the officer that I didn't have a gun and if they found one they needed to take fingerprints because mine wouldn't be on it.

15) The following day, two police officers came to the jail to speak with me, but I refused to talk to them.

16) A couple of days later, the officers returned with a warrant and told me that yhey wanted to take my dna.

17) I told them that it was good that they were taking the dna because my dna wouldn't be on anything they found other than my

pill bottles, my cell phone and my clothes

18) On september 30, 2010, I was taken to court in the federal building for the gun.

19) The Court appointed Mr. Reggie Aligada to represent me on the charge.

20) Mr. Aligada later came to the jail and asked me "what's your story."

21) I told him that I was walking from my barber shop when a police officer pulled up with his gun out yelling for me to get on the ground. I explained that I tried to tell the officer that I had a bad back and couldn't get down on the ground very fast but I did get on the ground face down. Then another cop came up and knee'd me in the back and began hitting me with his fists before forcing my arms to my back and cuffed me. I told him that I was then searched and the officer took my cell phone and credit card, medications and money, I was put in the back of the police car. I told him that I kept asking the police why I was being held all they would tell me is "you know". After I was taken to jail, I was told that I was being arrested for possession of a gun and drugs.

22) Mr. Aligada asked me if I was innocent of the charges and I told him that I was innocent and that the dna sample and fingerprint tests would prove it.

23) I asked Mr. Aligada if he would be able to get me a copy of the indictment and he told me he would get one to me. He then left the jail.

24) In early November, 2010, Mr. Aligada came to see me and gave me a copy of the

-3-

gave me a copy of the indictment. When I compared it to the police receipt I had, I noticed that the serial numbers didn't match. I told Mr. Aligada that the serial numbers on the police document and the numbers on the indictment were not the same and he told me that he would check into that because the numbers had to match.

25) Later, Mr. Aligada told me that the government had discovered the mistake on the indictment and superseded the indict to reflect the correct serial number of the gun.

26) On December 01, 2010, I was taken to court for a motions hearing and during the hearing the officers said that I had jumped from a Ford Explorer and started running, jumped a fence, fell on my face, where I dropped my cell phone case, got up and ran, fell again where I supposedly dropped a gun, crack pipe and lighter, they also said I had ran out of my shoes during the chase.

27) I told Mr. Aligada to have dna samples done on everything they found because mine wouldn't be on anything but my cell phone, case, credit card, and medications.

28) Mr. Aligada told me that he would investigate the facts, but that this was a "motions Hearing" so he couldn't bring any of that up right now because all we were trying to do is have the motions heard.

29) After the hearing, I was allowed to briefly speak with Mr. Aligada, I told him that I wanted him to try and find the people the officers claimed were involved. I told him that I wasn't in a car, I was walking, and that I wasn't at the

-4-

apartments, so whoever the person was that called the 911 in wouldn't be able to identify me as the person they saw with the gun. I also told him that if he would contact my doctor he would be told that there is no way I could have done the things the officers said I did because I was suffering from a serious back injury that wouldn't allow me to run and jump over fences.

30) Mr. Aligada told me that he would get on top of the things I told him about as soon as he got back to his office.

31) I was told by a prisoner in the jail that if the government didn't take me to trial within 70 days, my speedy trial rights were violated so I tried calling Mr. Aligada to ask him about it.

32) I told my family to try and call Mr. Aligada and ask him about the speedy trial issue.

33) In early February, 2011, Mr. Aligada told me that the trial date was set for February 28, 2011.

34) I asked him if he got my message about the speedy trial issue and he said "no, I didn't what about it," I told him that I was told that if the government didn't have me to court within 70 days, the indictment would have to be dismissed. I said that I have been in jail for over four months and that I thought the speedy trial thing was violated.

35) Mr. Aligada told me that my speedy trial rights had not been violated because the motions that were filed tolled the clock.

36) I asked him to file the speedy trial motion and he said

he would check into it and see if the time had expired, and if it has, he would file the motion.

37) I asked Mr. Aligada if he had been able to interview the witnesses we talked about and if he had seen my doctor yet.

38) He told me that he hadn't had the time to do it, but he would do it before the trial date.

39) I told him that it was important because the person that placed the 911 call would have to say I wasn't the person with the gun that day and the driver of the Explorer would have to say that it wasn't me that rand from his vehicle. I also told him that without those witnesses, I had no defense of my innocence of the charge.

40) Mr. Aligada assured me that he was going to get on it that day.

41) I asked if he had got my medical records yet and he said that he was going to do that in the next few days.

42) After that, he asked me if I wanted to plead guilty to the gun charge, I told him "no, why would I plead guilty to a charge I'm innocent of?"

43) He told me that he had to ask because it was his job. He then got up and left.

44) On the morning if the jury selection, I again asked Mr. Aligada if he had spoke to the witnesses I told him about and if he had spoke to my doctor and got my medical records.

45) Mr. Aligada told me that his ""investigator" had spoke to the 911 caller and the caller said that he knew me.

46) I asked Mr. Aligada "if the caller knows me did he say

-6-

that I was the person he saw at the apartments with the gun?"

47) Mr. Aligada told me that he wasn't sure what the caller had said, but that he was an alcoholic so he wasnt' going to call him to testify.

48) I asked Mr. Aligada if he had a copy of the statement given by the caller to his investigator that I could read.

49) Mr. Aligada told me that that he didn't have a statement from him.

50) I told Mr. Aligada "well, it seems to me that if he would have said that it was me, the government would have him as a witness to identify me, don't you agree with that?

51) Mr. Aligada said he didn't think that the police had interviewed the witness but at any rate, he wasn't going to be called.

52) I said to him "come on man, we already know all that, but the reason I wanted you to interview him was to see if he would testify for me, there is no way he could put me in the apartments with a gun, I wasn't there."

53) I then asked Mr. Aligada if he was able to interview the driver of the Ford Explorer that the police said I jumped from?

54) Mr. Aligada told me that he hasn't had the chance to talk to him.

55) I asked him if he even tried to find him?

56) He told me that he had looked at the police reports and there was no information there about the driver of the Explorer.

57) I then asked him if he had at least talked to my doctor and got my medical records?

58) Mr. Aligada said that he didn't think it would help me,

-7-

until the sentencing hearing where he would be able to use the information.

59) I became upset and said, "man, you aint done nothing I asked you to do have you, your talking about sentencing and I haven't even been convicted yet!"

60) Mr. Aligada told me that I didn't have anything to worry about because my fingerprints nor dna was on the gun, so I couldn't be found guilty.

61) I told him that I hoped so becasue he took the only other defense I had, he hadn't even talked to the people I asked him to and the police were going to lie on me because I beat them once before and they told me that they were going to get me for it.

62) Mr. Aligada told me that without fingerprints and dna, whatever the police said would be suspect.

63) We went to trial and Mr. Aligada was not prepared, he didn't have any knowledge of dna testing and relied totally on the government witnesses to establish that there was no dna found, or that it was inconclusive..

64) While the jury went to lunch, several people saw them in the cafeteria.

65) One of the jury members was seen talking to another person who had a cell phone and the phrase "...put this gun in the bag" was overheard between them.

66) The persons that overheard this notified Mr. Aligada about what they had heard and he told them to not have any contact with the jury, then he left the cafe.

-8-

67) Shortly after Mr. Aligada left the cafe, the person sho witnessed the incident was told that they would have to leave the building and were banned from the courthouse due to a complaint.

68) Mr. Aligada did not interview the people that overheard the incident to determine what had took place, and he attempted to ignore them by telling them that he could not speak to them.

69) Mr. Aligada did not take the steps needed to insure the serious breach of protocol was properly investigated by the court to insure that a record of the findings would be left for a reviewing court.

70) On July 31, 2012, I called home from the Tennessee prison where I am housed and was told that the St. Paul Crime Lab had been exposed as fabricating evidence to support convictions of innocent people.

71) I gathered information and filed a motion for new trial based on the evidence I discovered from the newspapers.

72) The motion was denied by the court due to it containing "impeaching evidence" only.

73) Mr. Aligada did not speak to any one at the crime lab prior to my trial to determine the reliability of the testing procedures used there.

**FURTHER AFFIANT/DECLARANT SAITH NOT**

EXECUTED THIS 15th ~~13TH~~ DAY OF AUGUST 2013
**THE FOREGOING IS TAKEN UNDER PENALTY OF PERJURY UNDRE 28 US.S 1746**

*Theodore Stinii Varney* (signature)