UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,                  Civil No. 13-2341 (JNE)
                                             Crim. No. 10-294 (JNE/FLN)
v.                                                ORDER

Theodore Stevie Varner,

        Defendant.

After a jury found Defendant Theodore Stevie Varner guilty of being a felon in possession of a firearm, the Court sentenced him to 235 months imprisonment. Mr. Varner appealed, and the Eighth Circuit affirmed. *U.S. v. Varner*, 678 F.3d 653 (8th Cir. 2012). Mr. Varner was represented throughout his trial and direct appeal by Reynaldo Aligada from the Office of the Federal Defender.

Following the Eighth Circuit's decision, Mr. Varner filed a pro se motion for a new trial based on newly discovered evidence, which the Court denied. ECF No. 91.

Mr. Varner has now filed a pro se motion to vacate or set aside his sentence under 28 U.S.C. § 2255, alleging ineffective assistance of counsel by Mr. Aligada. ECF No. 92. The Government has responded in opposition to Mr. Varner's motion. ECF No. 97.

Because the record conclusively shows that Mr. Varner is not entitled to relief, the Court will deny his § 2255 motion without an evidentiary hearing. *See Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

## Background

The Eighth Circuit's decision affirming Mr. Varner's conviction and sentence sets forth the pertinent details of the case:

> On the morning of September 22, 2010, Officers Douglas Whittaker and Benjamin Lego of the Saint Paul police department responded to a 911 weapons call. The 911 caller described the suspect as a black male with braids, wearing blue jeans and a dark hooded sweatshirt. When the officers arrived at the apartment building, Officer Lego saw a green Ford Explorer leaving the parking lot with the passenger in the vehicle matching the description provided by the 911 caller. Officer Lego ordered the driver to stop three times, but the driver did not comply and left the parking lot. Officer Lego radioed a request for assistance in stopping the vehicle, providing the description of the Explorer and its direction of travel. Officer Lego and Officer Whittaker then got back in their squad car to follow the vehicle. Another officer drove up to the apartment building as the Explorer was leaving and pursued the vehicle, but by the time he caught up, it had stopped and the passenger had fled.
> Officer Carl Schwartz was also in the area and responded to a call to stop a black male in jeans and a hooded sweatshirt running west on a specific street. Officer Schwartz saw a person matching the description, who was later identified as Varner, cross the street in front of the police car and run south. As Officer Schwartz turned into an alley, he saw Varner climb over a fence and fall into the alley about 100 feet in front of him. Officers Whittaker and Lego also drove into the alley in time to see Varner fall over the fence. Officer Whittaker saw a black item fall off Varner's waistband as he landed in the alley.
> Varner got up and kept running while Officer Schwartz got out of his squad car and gave chase. Officer Schwartz noticed a small black case on the ground as he ran by the location where Varner came over the fence. As Varner ran across a gravel driveway by a blue car, he fell again. Officer Schwartz did not see anything drop from Varner when he fell, but the officer saw a brown-handled semi-automatic handgun lying in the gravel as he ran by the car where Varner had fallen. Officer Schwartz continued to chase Varner for approximately another half-block, yelling at him to stop, before Varner finally complied. Officer Schwartz detained Varner until Officer Lego arrived to arrest Varner.
> Officer Schwartz, Officer Whittaker, and another officer retraced the path Varner ran in order to recover any items Varner may have dropped and to take photos of the route. Near the blue car, the officers recovered the firearm Officer Schwartz had seen as he chased Varner. Approximately 12-14 inches away from the firearm the officers also found a crack pipe. As the officers continued to follow the route, they found a black cell phone case where Varner had jumped over the fence. The case contained a credit card with Varner's name on it. The officers also recovered a green lighter and two black shoes.
> A grand jury charged Varner with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). At the two-day jury trial, four officers

> involved with apprehending Varner testified. Two analysts who tested the firearm for fingerprints and DNA evidence also testified that the tests were negative. The person who owned the house and the blue car next to where the police recovered the firearm also testified that the gun was not his and that nobody in his household owned a firearm. Finally, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives stated the weapon was manufactured in France and traveled in interstate and foreign commerce.
> . . . The jury subsequently found Varner guilty.
> At sentencing Varner argued for a downward departure due to extraordinary physical impairments under U.S.S.G. § 5H1.4. The Presentence Report (PSR) noted Varner suffered from serious back problems after being robbed by two assailants in February 2010. During the robbery, Varner was rammed into a door frame and kicked repeatedly in the back. Consequently, he was diagnosed with mobile spondylolisthesis. The PSR indicated Varner experiences significant pain when sitting and standing. He cannot stand or walk for more than seven or eight minutes without experiencing pain. The district court denied Mr. Varner's motion and imposed a sentence of 235 months (19 years and 7 months), the bottom of the advisory range.

*Varner*, 678 F.3d at 655-56.

On direct appeal, Mr. Varner through counsel argued that the evidence was insufficient to support the verdict, that the Court abused its discretion in admitting evidence of the crack pipe, and that the Court abused its discretion at sentencing by declining to depart downward on account of his injury. *Id.* at 656. The Eighth Circuit rejected each argument. *Id.* at 659.

### Discussion

I.        **Allegations of ineffective assistance of counsel.**

In his § 2255 motion, Mr. Varner alleges that he received ineffective assistance of counsel from Mr. Aligada in a variety of different ways spanning his pre-trial proceedings, trial, sentencing, and direct appeal.

To be entitled to relief based on a violation of the Sixth Amendment right to effective assistance of counsel, the movant must satisfy a two-part test: "First, the movant must show that 'counsel's representation fell below an objective standard of reasonableness.' . . . Second, the

3

movant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Engelen*, 68 F.3d at 241 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).  Because this *Strickland* test is conjunctive, "[t]he court need not address both components if the movant makes an insufficient showing on one of the prongs." *Engelen*, 68 F.3d at 241.

Section 2255 in turn specifies that the movant is entitled to an evidentiary hearing on the claims presented in his motion to vacate or set aside his sentence "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . ." 28 U.S.C. § 2255(b).  "Accordingly, a petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen*, 68 F.3d at 241 (citations omitted).  *See also Watson v. U.S.*, 493 F.3d 960, 963 (8th Cir. 2007).

As explained below, all of Mr. Varner's numerous allegations of ineffective assistance of counsel fail on their face.  None, therefore, warrant an evidentiary hearing.

**A.  Investigation of the facts and reports.**

Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by "fail[ing] to investigate the facts of the case" and by "fail[ing] to investigate police, forensic and medical reports."  Under these two headings, Mr. Varner faults Mr. Aligada for: (1) not calling the driver of the Ford Explorer and the 911 caller to testify at trial; (2) not presenting evidence of his back injury to the jury; (3) not presenting evidence to the jury that he was booked into jail

4

after his arrest wearing both shoes; (4) not adequately cross-examining the testifying officers; and (5) not uncovering the substandard practices of the St. Paul crime lab.

These specific allegations flow from a more general complaint that Mr. Varner expresses about Mr. Aligada's defense strategy.  In the proceedings before this Court and on direct appeal, Mr. Aligada argued that the Government's evidence was insufficient to prove beyond a reasonable doubt that Mr. Varner ever knowingly possessed the firearm that the officers recovered in the alley after his arrest, but did not contest that Mr. Varner was the individual whom the officers had chased through the alley.  *See, e.g.*, Transcript of Jury Trial at 66-77 (ECF No. 75) (Mr. Aligada's closing argument ending with question that "If the [officer] who chased Mr. Varner and was closes to him didn't know if the gun was his, how can you know?"); *Varner*, 678 F.3d at 656-57 (Eighth Circuit's rejection of Mr. Aligada's argument that the evidence was insufficient to support the verdict).

In his § 2255 motion, however, Mr. Varner articulates a different sort of defense: not only that he was not the suspect reported by the 911 caller to have a gun inside the apartment building, but also that he was not the passenger in the Ford Explorer who ran from the officers down the alley, jumping over a fence, falling twice, and dropping objects as he went.  In support of this new mistaken identity defense, Mr. Varner asserts in his declaration that on the morning he was arrested he had been "walking from my barber shop when I saw a police cruiser approaching me at a rapid rate of speed."  Mr. Varner claims that he simply continued walking until an officer drew his gun and ordered him to get on the ground.  At that point, Mr. Varner states that he complied with the order, but was handled roughly by the officers as they put him into handcuffs.  He was then transported in a patrol car and booked into jail.

Mr. Varner alleges that he communicated this version of events to Mr. Aligada during their first meeting, and that he subsequently urged Mr. Aligada to investigate it and pursue a mistaken identity defense. Mr. Varner further alleges that Mr. Aligada failed to conduct such an investigation, leaving him unprepared to subject the Government's case to proper adversarial testing at trial. Mr. Varner ascribes this failure to Mr. Aligada's belief that he was guilty, as allegedly demonstrated by Mr. Aligada's inquiry into Mr. Varner's desire to plead guilty and the references Mr. Aligada made to sentencing proceedings before the case had gone to trial.

However, Mr. Varner's allegations regarding this foregone mistaken identity defense fail to make out a viable claim of ineffective assistance of counsel. Mr. Aligada "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 131 S.Ct. 770, 789 (2011). The strategy that is evident from Mr. Aligada's performance at trial and on appeal was to focus on the gaps and weaknesses in the Government's evidence that Mr. Varner possessed the gun that was found in the alley, rather than to argue in the face of contrary evidence from multiple eye-witnesses that Mr. Varner was not the man seen fleeing through the alley.

Even if the latter would not have been inconsistent with the former, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Furthermore, the Court evaluates counsel's conduct from "[his] perspective at the time," without the "distorting effects of hindsight," and "must indulge a strong presumption that [it] falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation and citation omitted).

As described below, Mr. Varner's allegations, whether individually or collectively, cannot overcome this presumption.

**1. 911 caller and Ford Explorer driver.**

First, Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by allegedly failing to locate, interview, and call the driver of the Ford Explorer and the 911 caller to testify at trial. Mr. Varner argues that this was unreasonable and that these two witnesses would have testified that Mr. Varner was not the person seen in the apartment complex with a gun or in the passenger seat of the Ford Explorer. According to Mr. Varner, this evidence would have significantly undermined the Government's case and affected the outcome of the trial.

However, the record affirmatively refutes Mr. Varner's allegation that Mr. Aligada failed to investigate the testimony that these witnesses potentially could have offered. As the Government points out, Mr. Varner himself admits in his declaration that Mr. Aligada's investigator did in fact contact the 911 caller, who confirmed that he knew Mr. Varner. Furthermore, Mr. Varner's declaration also indicates that "Mr. Aligada told [Mr. Varner] that he wasn't sure what the caller had said, but that [the caller] was an alcoholic so he wasn't' (sic) going to call him to testify." Thus, it is evident on the face of Mr. Varner's submission that Mr. Aligada made a tactical decision, in light of his apparent concerns about the 911 caller's reputation and credibility, not to present the caller's testimony at trial. That decision is also consistent with Mr. Aligada's efforts to minimize any references by the Government's witnesses to the 911 caller's description of the suspect in the apartment building with a gun and to focus the jury instead on the events of the chase in the alley. *See* Section I.B below.

7

Regarding the driver of the Ford Explorer, Mr. Varner's own declaration indicates that Mr. Aligada "had looked at the police reports and there was no information there about the driver of the Explorer." Mr. Aligada also elicited testimony from the officers at trial that the police had not pursued the Explorer after it left the scene or even taken down its license plate. Transcript of Jury Trial at 73, 95, 109 (ECF No. 74). Therefore, regardless of Mr. Varner's speculation as to how the driver would have testified at trial, Mr. Aligada's investigation cannot have been deficient where it was frustrated by a lack of information as to the driver's identity and whereabouts.

### 2. Doctor and medical records.

Second, Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by failing to investigate a back injury Mr. Varner had suffered several months prior to his arrest. Mr. Varner argues that Mr. Aligada performed unreasonably by not presenting his medical records and/or the testimony of his doctor at trial, which Mr. Varner claims would have established for the jury that "it [was] impossible for him to perform the feats [of running, jumping, and climbing over fences in the alley] described by the prosecution witnesses."

However, the record and Mr. Varner's own declaration indicate that Mr. Aligada investigated his back injury and made a reasonable tactical decision about how to use this evidence. As Mr. Varner acknowledges in his submission, Mr. Aligada explained to him that he would not present evidence of his back injury at trial because "he didn't think it would help me until the sentencing hearing where he would be able to use the information." Mr. Aligada did use the evidence at sentencing to argue for a downward departure under United States Sentencing Guideline § 5H1.4. At that hearing, Mr. Aligada was questioned by the Court as to

8

how Mr. Varner could have "r[u]n and jumped and sprinted" through the alley as the officers testified if he was as severely injured as he then claimed. Mr. Aligada responded:

> Yes, and there was also testimony that he fell at least twice, maybe three times. I think that [the number of times Mr. Varner fell] was a point of dispute, at the end of the chase. So certainly from, and I included this in the sentencing position, in terms of the physical issues, if the Court will remember there was also some testimony about whether he lost his shoes or not.
> And so it suggests to me that in the present moment at that time, physical impairment was part of what happened in the chase that ultimately lead in (sic) him being arrested and apprehended. He did – I mean an important part of the testimony was falling in the alley on his tailbone and coming over a fence, and then falling again. And so it's my position that physical impairment was part of it then.
> . . . To be honest with you, Your Honor, I don't know whether the chase and falling on his tailbone exacerbated that [previous] injury, but in my mind and the records back up that there were serious back issues prior to [the chase].

Transcript of Sentencing Hearing at 11-12, 14 (ECF No. 76).

It is thus apparent that by Mr. Aligada's estimation, the evidence of Mr. Varner's back injury not only would not have convinced the jury that he was incapable of fleeing from the officers in the way they described, but may in fact have bolstered the officers' testimony by providing an explanation for why the suspect fell multiple times during the chase. Mr. Varner's allegation is therefore insufficient to overcome the presumption that Mr. Aligada's decision about when and how to use the evidence was a reasonable one.

### 3. Shoes.

Third, Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by failing to "investigate the matter of the shoes." Mr. Varner, noting that the testifying officers differed in their recollections as to whether he was barefoot or wearing only one shoe at the time he was arrested, alleges that he was "logged . . . into the jail with both his shoes on." On the basis of this alleged discrepancy, Mr. Varner argues that

9

> [a] reasonable juror could have concluded that the police had arrested the wrong person based on the facts that none of the officers had the suspect in view the entire time and the fact that the officers said the suspects (sic) shoes were at the crime scene and Mr. Varner's shoes were on his feet at the jail was sufficient to cause reasonable doubt and change the outcome of the proceeding.

However, even if Mr. Varner's allegation regarding his booking is accepted as true, it would not entitle him to relief. Any evidence that Mr. Aligada could have presented at trial to establish that Mr. Varner was booked into jail wearing both of his shoes would have been, at most, impeaching of the officers' testimony on that point. As it was, Mr. Aligada did highlight on cross-examination and in closing arguments the differences between the officers' accounts regarding the number of shoes Mr. Varner was wearing in an effort to call into question the accuracy and credibility of their recollections of the chase. *See, e.g.*, Transcript of Jury Trial at 294, 295 (ECF No. 75) (Mr. Aligada's closing argument emphasizing that the officers "disagree about how many shoes he was wearing at the time of his arrest" and stating that "[t]he most important piece of evidence of what Officer Schwartz couldn't remember was the number of shoes. . . . If he can't remember how many shoes the guy is wearing, how could he remember where the fall happened and where the gun was recovered?").

In these circumstances, where the record demonstrates that Mr. Aligada was keenly aware of the "matter of the shoes" and attempted to exploit it to Mr. Varner's benefit, Mr. Aligada is entitled to a presumption that his choice to do so without utilizing the booking evidence was a sound tactical decision rather than sheer neglect of the issue. There is no reasonable probability that Mr. Aligada's use of the additional impeachment evidence – assuming it exists – would have changed the outcome of the trial.

### 4. Cross-examination.

Fourth, Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by failing to adequately investigate the police reports that were generated in the case. Mr. Varner claims that this left Mr. Aligada unprepared to challenge the testifying officers, particularly Officer Schwartz, as to their accounts of the events around the chase.

However, the record contradicts Mr. Varner's allegation, as Mr. Aligada did in fact challenge each of the testifying officers on cross-examination. For example, Mr. Aligada elicited testimony from Officer Schwartz to the effect that he had not seen Mr. Varner hold, drop, or throw a gun during the chase in the alley; that he did not know that the unattended gun found in the alley was Mr. Varner's; and that he did not immediately communicate to his fellow officers that he had seen the unattended gun in the alley. Transcript of Jury Trial at 207-08 (ECF No. 74). Mr. Aligada had also previously cross-examined Officer Lego at the pretrial motions hearing regarding the report he produced. Transcript of Hearing on Motions at 24-29 (ECF No. 27). In addition, Mr. Aligada focused in his closing arguments at trial on the discrepancies between the officers' recollections of the events that occurred in the alley immediately prior to Mr. Varner's arrest. Transcript of Jury Trial at 295 (ECF No. 75) ("[The officers] disagree about just about everything that is relevant to the trail of evidence that the government has made so much noise about in this case. . . .").

### 5. Forensic testing.

Fifth, Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by failing to rigorously investigate the procedures utilized by the St. Paul Police Department Crime Laboratory ("SPPDCL"), which had conducted forensic testing of the gun that yielded no

11

identifiable fingerprints or DNA.  Mr. Varner argues that Mr. Aligada should have discovered the allegedly poor practices at the crime lab – which came to light in a different case after his conviction – such that the findings of the lab analysts who testified at his trial would have been called into question.

Mr. Varner's allegation here is similar to the claim he made in his pro se motion for a new trial, where he argued that "had the jury been aware of the testing failures of the SPPDCL, the result of his trial would have been different." ECF No. 85 at 3.  In denying that motion, the Court determined that "[t]he alleged poor practices of the St. Paul Police Department Crime Laboratory . . . are at most impeaching.  Varner has not demonstrated that they would probably result in an acquittal upon retrial." ECF No. 91 at 2.  Mr. Varner's allegation in this § 2255 motion, repackaged as an ineffective assistance claim, does not compel a different conclusion.  Therefore, even assuming without deciding that Mr. Aligada's investigation of the forensic evidence was somehow deficient, Mr. Varner cannot show the requisite prejudice from it under the second prong of the *Strickland* test.

**B. Hearsay.**

His mistaken identity defense aside, Mr. Varner also alleges that Mr. Aligada provided ineffective assistance of counsel by failing to object to the police officers' testimony regarding the 911 caller's description, relayed to them by a dispatcher, of a black male in jeans and a dark hoody who had been seen with a gun inside the apartment building.  Mr. Varner alleges that Mr. Aligada's failure to object to this testimony as hearsay was unreasonable and that it prejudiced him because the "repeated use of the 911 caller's description invited the jury to conclude that a man fitting Mr. Varner's description was seen armed with a gun."

However, the record affirmatively refutes Mr. Varner's allegation, as Mr. Aligada did in fact object strenuously to this testimony. During a discussion on the record and outside the presence of the jury on the first day of trial, Mr. Aligada anticipated that the Government would elicit testimony from the officers that would include the 911 caller's description. Transcript of Jury Trial at 100-13 (ECF No. 74). Mr. Aligada objected to that anticipated testimony as hearsay; ultimately, the Court directed the Government to structure its questioning of the officers so as to avoid any potential hearsay problem. *Id.* at 111-13.

### C. Speedy Trial Act.

Mr. Varner next alleges that Mr. Aligada provided ineffective assistance of counsel by "fail[ing] to move the court to dismiss the indictment on Speedy Trial Act violations." Liberally construed, Mr. Varner's motion faults Mr. Aligada for not pursuing two potential Speedy Trial Act violations, the first arising from the time that elapsed between his arrest and the filing of the indictment and the second arising from the time that elapsed between the filing of the indictment and the start of trial.

However, as explained below, Mr. Varner's Speedy Trial rights were not violated, and any argument Mr. Aligada would have presented to the Court in this regard would have been rejected. Trial counsel does not perform unreasonably in making, and a defendant is not prejudiced by, a decision not to pursue an unavailing line of argumentation.

#### 1. Time period between arrest and filing of indictment.

First, where a defendant is charged with an offense in a complaint, the Speedy Trial Act requires that that charge be "dismissed or otherwise dropped" if "no indictment or information is

13

filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter . . ." 18 U.S.C. § 3162(a)(1).  In turn, § 3161(b) requires that the information or indictment be filed within 30 days of the date on which the defendant was arrested in connection with the charge lodged in the complaint.

Mr. Varner accurately recounts that the complaint was filed on September 29, 2010; that he was taken into custody by the United States Marshals on a writ from Ramsey County Jail and made his initial appearance before the Magistrate Judge on September 30, 2010; and that the indictment was filed on November 1, 2010, more than 30 days after his arrest.

However, § 3161(h) excludes various periods of time from the 30 days that are permissible between arrest and indictment, including "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(D).  A motion for detention by the Government, even an oral motion, is one of these "pretrial motions."  *U.S. v. Moses*, 15 F.3d 774, 776-77 (8th Cir. 1994).

In Mr. Varner's case, the Government made an oral motion for detention before the Magistrate Judge during his initial appearance on September 30, 2010.  ECF No. 4.  The Magistrate Judge entered an order of temporary detention and scheduled a detention hearing for October 4, 2010, at the conclusion of which she granted the Government's motion for detention.  ECF No. 6.  Therefore, the period between the oral motion for detention on September 30, 2010 and the Magistrate Judge's disposition of the motion on October 4, 2010 is excluded from the 30 days that are permissible under § 3162(a).  The time lapse between Mr. Varner's arrest and indictment thus did not violate his Speedy Trial Act rights.

### 2. Time period between filing of indictment and trial.

Second, the Speedy Trial Act requires that the information or indictment "shall be dismissed on motion of the defendant" if the defendant "is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h) . . ." 18 U.S.C. § 3162(a)(2). In turn, § 3161(c)(1) requires that the trial of a defendant who has pled not guilty begin within 70 days of the filing of the indictment. Section 3161(h)(1)(D) excludes from that 70 days period "[a]ny period of delay . . . resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion . . ."

In Mr. Varner's case, the indictment was filed on November 1, 2010. Mr. Varner through counsel filed a number of pretrial motions on November 24, 2010. The Magistrate Judge issued a Report and Recommendation on the motions on December 21, 2010, to which Mr. Aligada objected on January 4, 2011. The Court adopted the Report and Recommendation on January 25, 2011. Trial began on February 28, 2011.

There is no dispute that the Speedy Trial clock ran between the filing of the indictment on November 1 and the filing of the pretrial motions on November 24, as well as between the Court's adoption of the Report and Recommendation on January 25 and the commencement of trial on February 28. These two periods amount to 57 days.

The Court understands Mr. Varner's motion to argue that the clock was also running during the period between the Magistrate Judge's issuance of the Report and Recommendation on December 21 and Mr. Aligada's objection on January 4. However, the Eighth Circuit has been clear that the period between the issuance of a Report and Recommendation and the filing of an objection is excludable from the 70 days that are permissible under § 3162(c)(1). *U.S. v.*

*Long*, 900 F.2d 1270, 1275 (8th Cir. 1990). The time that elapsed between the indictment and the beginning of trial thus did not violate Mr. Varner's Speedy Trial rights.

### D. Juror misconduct.

Mr. Varner also alleges that Mr. Aligada provided ineffective assistance of counsel by not properly investigating a potential instance of juror misconduct that arose during deliberations and by failing to move for a hearing on it. Mr. Varner alleges that he "suffered extreme prejudice" from Mr. Aligada's failure to pursue the issue because he was left without "a record for the appellate court to review."

Mr. Varner's allegation centers on a letter written by Tracie Jay Gholar. *See* ECF No. 55-1. In the letter, Ms. Gholar indicates that she was under subpoena by the Government during Mr. Varner's trial, and that she and members of her family were in the courthouse to support Mr. Varner on the day the case was submitted to the jury. *Id.* at 1. Ms. Gholar goes on to explain that she was in the courthouse café when the jury, escorted by a Marshal, entered and sat down to eat lunch in a reserved room. *Id.* at 1-2. Ms. Gholar says that she overheard the Marshal remind the jury that they should leave their cell phones upstairs in chambers. *Id.* at 2. With that prompting, three jurors left the room, and Ms. Gholar states that she saw one of them with a cell phone in her hand. *Id.* When these three jurors returned to the café, Ms. Gholar states that she overheard bits and pieces of their conversation, which included the phrase "gun in a bag." *Id.* at 3. Shortly thereafter, the jury left the café and was escorted back upstairs to resume their deliberations. *Id.*

Two weeks after Mr. Varner was convicted by the jury, Mr. Aligada moved for a new trial on the basis of jury misconduct. ECF No. 55. Mr. Aligada attached Ms. Gholar's letter to

his motion and requested an evidentiary hearing to "investigate" whether the jury had been exposed to outside influences "[g]iven the apparent possession of at least one cellphone by a juror during deliberations . . ." *Id.* at 3.  Shortly before sentencing, Mr. Aligada withdrew the motion.  Letter to District Judge (ECF No. 63).

Mr. Aligada's withdrawal of the motion was neither unreasonable or prejudicial to Mr. Varner.  To the extent that Ms. Gholar alleges that she overheard fragments of a discussion among the jurors during their lunch in the café, that discussion was internal to the jury and "Federal Rule of Evidence 606(b) prohibits any inquiry into internal jury deliberations." *Moses*, 15 F.3d at 778 (citing *Tanner v. U.S.*, 483 U.S. 107, 125 (1987)).

Rule 606(b)(2)(B) does provide an exception that would permit a juror to testify regarding whether "outside influence was improperly brought to bear upon any juror . . ." Nevertheless, the Court has "broad discretion in managing juror misconduct allegations." *U.S. v. Wintermute*, 443 F.3d 993, 1002 (8th Cir. 2006).  An evidentiary hearing is warranted only where a party "raise[s] a colorable claim of outside influence"; "[s]peculation and unsubstantiated allegations do not present [such] a colorable claim . . ." *Id.* at 1002-03 (quoting *Moses*, 15 F.3d at 778).  *See also U.S. v. Tucker*, 137 F.3d 1016, 1030-31 (8th Cir. 1998) (noting that a party is entitled to a hearing if he "shows that outside contact with the jury presents a reasonable possibility of prejudice to the verdict").  Ms. Gholar's allegation that three jurors left the café to put their cell phones away at the Marshal's request simply does not amount to a colorable claim that any juror was subject to outside influence.  Without one, the Court had no basis on which to allow the "investigation" Mr. Aligada initially requested to go forward.

Thus, as with Mr. Varner's allegations around the Speedy Trial Act, Mr. Aligada did not perform unreasonably in deciding not to pursue a course that was so plainly unavailing, and Mr. Varner cannot have been prejudiced by that choice.

### E. Sentence.

Finally, Mr. Varner alleges that Mr. Aligada provided ineffective assistance of counsel by "fail[ing] to object to the 235 month sentence" imposed by the Court, which resulted in him being "subjected to a sentence beyond the range authorized by the statute." Mr. Varner also alleges that Mr. Aligada's failure to object "foreclosed [his] ability to raise the issue before the appeals court."

Mr. Varner's allegations are again contradicted by the record. Mr. Aligada argued, both in his pre-sentencing brief and at the sentencing hearing, for a downward departure from the 235-293 month Sentencing Guidelines range to the 15-year mandatory minimum based on a number of factors, including the severity of Mr. Varner's back injury. Defendant's Sentencing Position (ECF No. 60); Transcript of Sentencing at 8-20 (ECF No. 76). Furthermore, after the Court denied the downward departure and sentenced Mr. Varner to the low end of the Guidelines range, Mr. Aligada pursued the argument on direct appeal to the Eighth Circuit, which also rejected it. *Varner*, 678 F.3d at 658-59.

### II. Certificate of appealability.

An appeal cannot be taken from a final order denying a § 2255 motion without a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22(b)(1). A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of

a constitutional right." 28 U.S.C. § 2253(c)(2). As here, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Mr. Varner has not demonstrated that reasonable jurists would find the rejection of his claim debatable or wrong. The Court will decline to issue a certificate of appealability.

\* \* \*

Therefore, based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant's Pro Se Motion to Vacate under 28 U.S.C. § 2255 [ECF No. 92] is DENIED.
2. A certificate of appealability is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 18, 2013        s/Joan N. Ericksen
                                The Honorable Joan N. Ericksen
                                United States District Judge